UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAMIENE BOLES, | ) | Case No. 3:12CV225 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| WARDEN, TOLEDO | ) | **Report and Recommendation** |
| CORRECTIONAL INSTITUTION | ) | **of Magistrate Judge** |
| | ) | |
| Respondent. | ) | |
| | ) | |

On January 20, 2012[1], Petitioner Damiene Boles ("Petitioner"), acting *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. ECF Dkt. #1. Petitioner seeks relief for alleged constitutional violations that occurred during his trial in the Lucas County, Ohio Court of Common Pleas, where he was convicted of one count of murder in violation of Ohio Revised Code ("ORC") §2903.02(A) and 2929.02. ECF Dkt. #8-1 at 6. On June 14, 2012, Respondent Warden, Toledo Correctional Institute ("Respondent"), where Petitioner is incarcerated, filed an answer/return of writ. ECF Dkt. #8. Petitioner filed his traverse on September 10, 2012. ECF Dkt. #12. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

I.    **SYNOPSIS OF THE FACTS**

The Sixth District Court of Appeals of Ohio set forth the relevant facts on direct appeal. ECF Dkt. #8-1 at 462-488. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing

---

[1]The filing date for a petition from an incarcerated *pro se* petitioner is the date the petition was handed over to the prison mail system, not the date it was received and docketed by the federal habeas court. *Houston v. Lack*, 487 U.S. 266, 270-72, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988).

evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999):

> {¶ 29} The undisputed facts relevant to the issues raised on appeal are as follows. Cori Key was murdered in Toledo, Ohio, sometime after 12:00 a.m. on July 31, 2004. Her body was found in her home by her father in the early evening hours of July 31; she had been stabbed twice, once through the heart. Appellant, who was Key's boyfriend and the father of one of her children, was identified as a suspect. Appellant submitted to a police interview in the hours immediately following the murder, but he was not charged with the crime, and the case went cold for more than two years. The case eventually was reopened, and in December 2006, appellant was indicted for Key's murder. Appellant entered a plea of not guilty and was tried by a jury. A verdict of guilty was returned on July 19, 2007, and the trial court imposed a sentence of 15 years to life.
> . . .
>
> {¶ 79} The jury in this case heard extensive testimony on behalf of the state from 11 family members, friends, and acquaintances of the victim; the Lucas County deputy coroner; seven police officers; and two forensic scientists. The defense presented four witnesses, one of whom was a friend of appellant's and three of whom were employees of a bar where appellant was seen the night of the murder.
>
> {¶ 80} Key's father testified that he discovered Key's body in the bathroom of her home at approximately 6 p.m. on July 31, 2004, and immediately called 911. Key's father also testified that when he was standing outside the house after the police arrived, appellant approached him and said that when the police tested Key's fingernails for DNA evidence, they would see that he did not murder her. Additionally, Key's friend, Cheri Thompson, testified that appellant went to see her the day after the murder and told her that the police would not find his DNA under Key's fingernails because he did not kill her. He also told Thompson that he would not have to break into Key's house because he had his own key. Thompson described Key and appellant's relationship as "abusive."
>
> {¶ 81} Yvonne Booth testified that Key had had a manicure before they went out to dinner on July 30. When shown a photograph of Key's fingernails after the murder, Yvonne stated that Key's nails were a lot shorter in the photo and did not look the same as they had earlier in the evening. Kenneth Johnson testified that he was a nail technician and gave Key a manicure on July 28 or 29, 2004. When he was shown the photograph of Key's fingernails after her death, he stated that it did not depict his work and that he had never seen her with fingernails that short.
>
> {¶ 82} Several police officers testified about the condition of the scene when they responded to the initial call from Key's father. The Lucas County deputy coroner testified about her examination of the body at the scene and during the autopsy. She stated that she was unable to find any DNA evidence under Key's fingernails.
>
> {¶ 83} Several of Key's friends testified that they had gone out to dinner with Key on the evening of July 30, 2004. Satyra Hodrick testified that Key had dropped her off at home around 10:00 p.m. At approximately 11:45, Key called Satyra and said that appellant had broken into her house. Key sounded upset, and Satyra told her to go somewhere else for the night. She did not hear from Key again.

{¶ 84} Key's friend, Teshauna Isaac, also testified that Key had called her shortly before midnight using another friend's phone and said that someone had pushed her window air conditioner in and had gone into her house; shampoo had been poured into her two house phones so that they would not work. Key told Teshauna that she was going back home to lock up and go to bed. Teshauna did not hear from her again. Teshauna testified that Key had been talking about breaking up with appellant for several months prior to the murder. Teshauna further testified that in April 2004, she took Key home after Key and appellant had an argument while the three of them were out at a local bar. When Teshauna returned to the bar after taking Key home, appellant told her he was going home "to beat his bitch ass." Teshauna left the bar later and went to Key's house. When she knocked on the door, appellant answered; he said he did not want any "bitches" calling the house and punched Teshauna in the face. Although Key and appellant still saw each other after that night, Key had made appellant move out of her house and had changed the locks. Teshauna considered appellant to be jealous and controlling and testified that Key was afraid of appellant. Key's friend Harriett Hardy also testified that she believed Key was afraid of appellant.

{¶ 85} Sevequa Glenn, Key's neighbor, testified that after dark on the night of the murder, she saw appellant, whom she knew was Key's boyfriend, drive up, park his car on the street, and walk to Key's house. Glenn saw appellant "mess with" one of the windows as if he were trying to open it. Glenn did not watch appellant continuously but saw him leave approximately 30 minutes later. As soon as appellant left, Glenn saw Key drive up. She crossed the street and told Key she had just seen appellant at her house.

{¶ 86} Rubin Smith, another of Key's neighbors, testified that he woke up in the middle of the night on July 31, 2004, and while he was looking out his kitchen window, he saw appellant leave Key's house and run to her garage. Smith stated that there is a light behind Key's house and that he had no doubt it was appellant he saw. Appellant was wearing jeans, a leather jacket, and gloves. Smith saw appellant back out of Key's garage on his motorcycle and slowly drive away. Smith further testified that the following afternoon, when he was standing outside with other onlookers after the police arrived, appellant approached him and asked whether he had heard or seen anything; Smith said he had not. Appellant then told Smith that if he said anything to the police "something bad was going to happen." Smith later told a detective what appellant had said.

{¶ 87} Sergeant Tim Campbell, who interviewed appellant after investigating the crime scene, testified that appellant had "fresh scratches" on his stomach and back. Appellant told him he was scratched the night before while shadowboxing with a friend. He told Campbell that he had his shirt on while shadowboxing.

{¶ 88} Jeannine Lamb testified that she lived next door to Key and that on the night of the murder, she heard a motorcycle directly outside at approximately 3:00 a.m. but did not see who was driving it. She further testified that appellant later "confronted" her and said, "[H]e knows where [she] stayed at," which frightened her. Appellant then told her that if she told anybody what she knew, "something would happen to" her.

{¶ 89} Toledo Police Sergeant Steve Forrester, supervisor of the cold-case unit, testified that the unit decided to reopen Key's murder case in 2006 upon the request of the original detective. Forrester testified that the unit examined phone records from three of appellant's phones and two of Key's phones prior to the murder and compared them to the statements appellant gave the police at that time. The

detectives concluded that based on those comparisons, statements appellant gave during his interview with the original detective in 2004 could not have been true. In support of that conclusion, while acknowledging that the phone records cannot identify the individual making the calls, Forrester provided the following information. Between 4:26 p.m. and 9:15 p.m. on the evening of the murder, appellant placed 54 calls to Key. Also, during a one-hour period that evening—when appellant had told detectives that Key was with him at work—phone records showed outgoing calls from Key's home phone, one of which was to appellant's cell phone. There also was an outgoing call from appellant's business phone to Key's home phone during that time. Additionally, although appellant told the police that he went to Key's house between 9:00 p.m. and 10:00 p.m. that evening looking for her, the records showed 16 calls from his business phone during that time frame. Lastly, despite having told police he was at the bar from 10:00 p.m. until 1:00 a.m. that night, the phone records show at least nine calls made from appellant's business shortly after 10:00 p.m. Nine more were made shortly after midnight, also from his business. In all, between 10:06 a.m. on July 30, 2004, and 2:39 a.m. on July 31, 2004, a total of 93 calls were made from appellant's business and cell phones to Key's phones; 24 of those calls were made between 12:01 a.m. and 12:58 a.m. on July 31.

{¶ 90} Forrester also testified to other inconsistencies between appellant's statements to police the day of the murder and his statements to the detective when the case was reopened. Those statements concerned such issues as appellant's and Key's whereabouts on the evening of the murder, whether or not appellant knew that Key was going out to dinner with friends that evening, and whether he and Key were planning to get married in two weeks. Forrester also noted inconsistencies in appellant's statements regarding whether he was bothered by Key's going out to dinner with her friends, whether he was angry that she did not answer his calls that evening, whether he was concerned about her plans to leave town with friends that weekend, and whether the scratches on his chest happened while "play fighting" with a friend or during sex with Key the night before the murder.

{¶ 91} The defense presented testimony from the bouncer at the bar the night of the murder, who recalled appellant being there for a while but did not know what time appellant arrived or when he left. In contrast to appellant's original statement to police that scratches on his chest were the result of horseplay at the bar, the bouncer denied seeing appellant or anyone else "play fighting" enough to get scratched. The manager of the bar and the bar's owner both also confirmed that appellant was there but could not confirm exactly when appellant left.

*State v. Boles*, 190 Ohio App.3d 431, 438, 448-450, 942 N.E.2d 417 (2010).

## II.  PROCEDURAL HISTORY

### A.  State Trial Court

In the September term of 2006, the Lucas County, Ohio Grand Jury indicted Petitioner for one count of murder in violation of ORC §2903.02(A), and 2929.02.  ECF Dkt. #8-1 at 6. ORC §2903.02(A) reads, in pertinent part, "no person shall purposely cause the death of another." At his arraignment, Petitioner entered a plea of not guilty.  ECF Dkt. #8-1 at 8.  On July 19, 2007, the jury

-4-

returned a guilty verdict on the sole count of murder.  *Id.* at 9-11.  On July 23, 2007, the trial court sentenced Petitioner to a term of imprisonment of fifteen years to life.  *Id.* at 12-13.

## B.    Direct Appeal

On July 30, 2007, Petitioner, through counsel, filed a notice of appeal to the Ohio Court of Appeals for the Sixth District.  *Id.* at 14-15.  Petitioner raised the following assignments of error in his appellate brief:

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF APPELLANT, DAMIENE A. BOLES, IN ADMITTING HEARSAY. TRIAL TR. VOL. III, 422:8-14; 516:20-517:13.

ASSIGNMENT OF ERROR NO. 2

THE VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF BOLES' RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. TRIAL TR. VOL. II, III, IV, & V.

ASSIGNMENT OF ERROR NO. 3

THE CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF BOLES' RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. TRIAL TR. VOL. II, III, IV & V.

ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED TO THE PREJUDICE OF BOLES BY LIMITING HIS ABILITY TO CROSS EXAMINE A WITNESS IN ORDER TO IMPEACH ANOTHER WITNESS IN VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE APPLICABLE PROVISIONS OF THE OHIO CONSTITUTION, AND IS CONTRARY TO THE EXPRESS PROVISIONS OF EVID. R. 616. TRIAL TR. VOL. IV, 726:9-13.

ASSIGNMENT OF ERROR NO. 5

PROSECUTORIAL MISCONDUCT DEPRIVED BOLES OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION. THIS MISCONDUCT CONSTITUTES PLAIN ERROR. TRIAL TR. VOL. V, 918:2-12, 14-15; 922:19-20; 923:23-924:3.

ASSIGNMENT OF ERROR NO. 6

BOLES WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION. TRIAL TR. VOL. III 471-502; VOL. IV. 739:1-740:1; VOL. V, 918:2-12, 14-15; 922:19-20; 923:23-924:3; STATE'S EXHIBIT 80.

ASSIGNMENT OF ERROR NO. 7

CUMULATIVE ERROR DEPRIVED BOLES OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION. TRIAL TR. VOL. II, III, IV & V.

*Id.* at 18-20. On February 6, 2009, the Sixth District Court of Appeals affirmed Petitioner's conviction and sentence. *Id.* at 121-142.

### C. <u>Supreme Court of Ohio</u>

On March 19, 2009, Petitioner, through counsel, filed a notice of appeal to the Supreme Court of Ohio. *Id.* at 146-148. In his memorandum in support of jurisdiction, Petitioner raised the following propositions of law:

1. A HEARSAY STATEMENT IS NOT ADMISSIBLE AS AN EXCITED UTTERANCE WHEN THE DECLARANT IS REFLECTIVE, SEEKING SPECIFIC AND THOUGHT OUT ACTIONS FROM THE PERSON TO WHOM THE STATEMENT WAS MADE.

2. EVIDENCE THAT THE DEFENDANT MIGHT HAVE COMMITTED THE CRIME IS INSUFFICIENT TO SUPPORT A CONVICTION EVEN WHEN NO OTHER SUSPECT IS IDENTIFIED DURING TRIAL.

3. A TRIAL COURT'S LIMITATION OF A DEFENDANT'S RIGHT TO CHALLENGE THE CREDIBILITY AND IMPEACH THE TESTIMONY OF THE STATE'S WITNESSES THROUGH CROSS-EXAMINATION VIOLATES THE CONFRONTATION CLAUSE AND THE RIGHT TO PRESENT A DEFENSE.

4. A PROSECUTOR'S IMPROPER AND PREJUDICIAL COMMENTS DURING REBUTTAL CLOSING ARGUMENT VIOLATE A DEFENDANT'S RIGHT TO A FAIR TRIAL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE OHIO CONSTITUTION AND BY SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

5. A CONVICTION MUST BE REVERSED WHEN DEFENDANT'S TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE.

-6-

*Id.* at 150.  On June 3, 2009, the Supreme Court of Ohio dismissed the appeal as not involving any substantial constitutional question.  *Id.* at 197.

### D.  Petition to Vacate or Set Aside Judgment

On July 7, 2008, Petitioner, through counsel, filed a petition for post-conviction relief pursuant to O.R.C. 2953.21.  Tr. at 198-241.  Petitioner alleged that his trial counsel was ineffective based upon his failure to cross-examine the coroner regarding the time of death of the victim and his failure to consult and present the testimony of a forensic expert.  On October 9, 2008, the trial court

denied the petition.  Tr. at 256-266.  No appeal was taken.

### E.  Application to Reopen Appeal and Motion to Vacate and Remand

On May 6, 2009, Petitioner, through counsel, filed an application to reopen his appeal pursuant to Ohio Appellate Rule 26(B).  Petitioner asserted that his appellate counsel was ineffective based upon his failure to raise assignments of error challenging the jury instructions, representative venire, the testimony of Detective Steve Forrester, and the trial court's failure to issue a final, appealable order.  Petitioner, through counsel, contemporaneously filed a Motion to Vacate and Remand.  Tr. at 298-307. Petitioner argued that, because the sentencing entry did not state that he was found guilty by a jury, it was not a final appealable order and did not confer jurisdiction on the appellate court, citing *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330.  On September 14, 2009, the Sixth District denied Petitioner's motion to vacate, but granted the motion to remand and remanded the matter to the trial court to consider the *Baker* issue.  On October 5, 2009, the trial court issued a *nunc pro tunc* sentencing entry that complied with the requirements set forth in *Baker*. Tr. at 338.

### F.  Second Direct Appeal

On November 4, 2009, Petitioner, through counsel, filed a Notice of Appeal in the Sixth District.  Tr. at 342-344.  Petitioner raised the following assignments of error in his appellate brief:

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT'S IMPROPER ADMISSION OF HEARSAY EVIDENCE DENIED MR. BOLES HIS RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 2

THE IMPROPER OPINION TESTIMONY AND ARGUMENT BY STATE WITNESS DET. FORRESTER DEPRIVED MR. BOLES OF HIS RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 3

PROSECUTORIAL MISCONDUCT DURING OPENING STATEMENT AND REBUTTAL CLOSING ARGUMENT DEPRIVED MR. BOLES OF HIS RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 4

THE COURT'S IMPROPER JURY INSTRUCTION TELLING THE JURY THEIR JOB WAS TO DETERMINE BOLES' "GUILT OR INNOCENCE" VIOLATED BOLES' RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 5

BOLES' TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHEN THEY:

1.    FAILED TO OBJECT TO THE VENIRE AFTER THE ONLY AFRICAN-AMERICAN JUROR WAS EXCUSED;

2.    FAILED TO OBJECT TO THE CORONER'S TESTIMONY REGARDING THE TIME OF DEATH;

3.    FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT;

4.    FAILED TO OBJECT TO HEARSAY TESTIMONY;

5.    FAILED TO OBJECT TO IMPROPER JURY INSTRUCTION REGARDING JURY'S ROLE.

ASSIGNMENT OF ERROR NO. 6

THE TRIAL COURT'S IMPROPER LIMITING OF DEFENSE COUNSEL'S CROSS-EXAMINATION OF STATE WITNESSES DEPRIVED MR. BOLES OF HIS RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 7

CUMULATIVE ERROR REQUIRES A NEW TRIAL.

ASSIGNMENT OF ERROR NO. 8

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT OF GUILTY OF MURDER.

ASSIGNMENT OF ERROR NO. 9

THE JURY'S VERDICT IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

Tr. at 367-368.  The state filed a motion to dismiss the appeal arguing that Petitioner was not entitled to a second direct appeal.  Tr. at 345-352.  However, the Sixth District concluded that it did not have jurisdiction over Petitioner's first direct appeal.  Tr. at 365.  On November 12, 2010, the Sixth District Court of Appeals, for a second time, affirmed Petitioner's conviction and sentence.  *Id.* at 462-551.

### G.    Supreme Court of Ohio

On December 22, 2010, Petitioner, through counsel, filed a notice of appeal to the Supreme Court of Ohio.  *Id.* at 489-491.   In his memorandum in support of jurisdiction, Petitioner raised the following propositions of law:

> 1. A DEFENDANT'S RIGHTS ARE VIOLATED BY THE WRONGFUL ADMISSION OF HEARSAY AND OUT-OF-COURT TESTIMONIAL EVIDENCE.
>
> 2. A LAY WITNESS'S TESTIMONY WHICH CROSSES FROM OPINION TO ARGUMENT EXCEEDS THE PERMISSIBLE SCOPE OF EVID.R. 701 AND VIOLATES A DEFENDANT'S RIGHT TO A FAIR TRIAL.
>
> 3. PROSECUTORIAL MISCONDUCT MAY CONSTITUTE PLAIN ERROR.
>
> 4. A COURT COMMITS PREJUDICIAL ERROR WHEN IT TELLS A JURY THAT IT IS TO DETERMINE WHETHER THE DEFENDANT IN A CRIMINAL TRIAL IS INNOCENT.
>
> 5. TRIAL COUNSEL'S FAILURE TO OBJECT TO PREJUDICIAL ERROR IS OBJECTIVELY UNREASONABLE AND, BECAUSE THE ERROR IS PREJUDICIAL, DENIES A CRIMINAL DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE IS ENTITLED.
>
> 6. A CRIMINAL DEFENDANT HAS THE RIGHT TO ASK QUESTIONS DESIGNED TO REVEAL THAT THE TESTIMONY OF A WITNESS FOR THE STATE IS NOT CREDIBLE.
>
> 7. A CRIMINAL DEFENDANT'S RIGHTS TO DUE PROCESS AND FAIR TRIAL ARE VIOLATED BY A CONVICTION BASED ON INSUFFICIENT EVIDENCE.

Tr. at 493.  On March 16, 2011, the Supreme Court of Ohio dismissed the appeal as not involving any substantial constitutional question.  *Id.* at 554.

### H.    Petition to Vacate or Set Aside Judgment

On June 14, 2010, Petitioner, through counsel, filed a petition for post-conviction relief pursuant to O.R.C. 2953.21.  Tr. at 555-608.  Petitioner raised the same issues as he raised in his first petition to vacate or set aside.  On July 27, 2010, the trial court denied the petition as untimely filed. Tr. at 644-649.  On February 3, 2011, Petitioner, through counsel, filed a notice of appeal. Tr. at 649. On February 3, 2012, the Sixth District affirmed the decision of the trial court.  Tr. at 701-707. On March 13, 2012, Petitioner, acting *pro se*, filed his notice of appeal to the Ohio Supreme Court. Tr. at 708.  Petitioner asserted a single proposition of law: The trial court erred finding that appellant's petition for post-conviction relief was filed outside the 180-day time limit.  Tr. at 712.  On May 23, 2012, the Supreme Court dismissed the appeal as not involving any substantial constitutional question.  Tr. at 775.

## III.    28 U.S.C. § 2254 PETITION

On January 20, 2012, Petitioner, acting *pro se*, filed the instant petition for a writ of habeas corpus.  ECF Dkt. #1.  Petitioner raises the following grounds for relief:

GROUND ONE

JUDGE IMPROPERLY ADMITTED HEARSAY FROM RUBIN SMITH WHEN HE ALLOWED MR. SMITH TO TESTIFY THAT THE VICTIM CLAIMED TO HAVE TOLD HIM THAT I "WAS" TALKING ABOUT KILLING HER. SINCE MR. SMITH DIDN'T HEAR THIS "ALLEGED" THREAT HIMSELF. THAT WOULD MAKE HIS TESTIMONY DOUBLE HEARSAY. NOR WOULD IT FALL UNDER THE "STATE OF MIND" EXCEPTION.

GROUND TWO

IMPROPER TESTIMONY WAS ALLOWED BY SATRA HODRICK WHEN SHE TESTIFIED THAT THE VICTIM'S NEIGHBOR, SEVEQUA GLEN TOLD THE VICTIM THAT SHE SAW ME BREAK INTO HER HOUSE. THE VICTIM THEN TOLD MS. HODRICK AT A DINNER THAT TOOK PLACE WELL BEFORE MS. KEY EVEN LEARNED ABOUT THIS ALLEGED BREAK-IN. IN CHAMBERS, THE JUDGE SAID HE'D WILL ALLOW THE TESTIMONY AS "EXCITED UTTERANCE" IF THE STATE COULD PRODUCE A "EYEWITNESS" TO TESTIFY ABOUT SEEING ME BREAKING INTO THE HOUSE AS THIS WOULD CAUSE THE STARTLING EVENT AGAINST ME FOR THE "EXCITED UTTERANCE" RULE TO COME INTO PLAY. THE EYEWITNESS, MS. GLEN TESTIFIED THAT SHE SAW ME EARLIER IN THE NITE [SIC] MESSING WITH THE WINDOW, BUT THAT I DID NOT ENTER THE HOUSE. MS. GLEN ALSO TESTIFIED THAT NOT ONLY WAS SHE NOT ALARMED TO SEE ME AT THE HOUSE OR TO BE "MESSING" WITH A WINDOW. BUT SHE "NEVER" TOLD THE VICTIM, HER GRANDMOTHER WITH WHOM SHE LIVED WITH OR ANYONE ELSE THAT I WAS AT THE

-10-

HOUSE OR MESSING WITH ANYTHING, LET LONE A WINDOW. MS. GLEN'S TESTIMONY OF NOT WITNESSING ME BREAK INTO THE VICTIMS HOUSE, NOR TELL ANYONE THAT I WAS EVEN THERE, KILLS ANY REASON THE JUDGE COULD USE TO JUSTIFY LETTING THE HEARSAY, DOUBLE HEARSAY AND THE HEARSAY-WITH-IN HEARSAY IN AS EXCITED UTTERANCE OR THE STATE OF MIND EXCEPTION, THE JUDGE DID NOT GO BACK AND INSTRUCT THE JURY TO DISREGARD MS. HODRICK'S TESTIMONY AS HEARSAY ONCE HE LEARNED THE STATE DIDN'T HAVE AN EYEWITNESS TO TESTIFY TO ME BREAKING INTO THE HOUSE. THE STATE CAN'T ASSUME THAT THEY WOULD'VE GOTTEN A GUILTY VERDICT AGAINST ME WITH JUST THE CIRCUMSTANTIAL EVIDENCE THEY HAD LEFT.

GROUND THREE

IMPROPER OPINION EVIDENCE TESTIMONY AND ARGUMENT BY THE STATE'S WITNESS DETECTIVE STEVE FORRESTER DEPRIVED ME OF A FAIR TRIAL. A GREAT DEAL OF THE PURPORTED STRENGTH OF THE STATE'S CASE RESTED UPON ALLEGED INCONSISTENCIES BETWEEN STATEMENTS MADE BY ME AND EVIDENCE CONTAINED IN TELEPHONE RECORDS OBTAINED AND OFFERED BY THE STATE WITNESSES. RATHER THAN SIMPLY ADMIT THE RECORDS AND MY STATEMENT, THE STATE LED COLD CASE DET. FORRESTER THROUGH HIS OWN ANALYSIS AND COMMENTARY OF A COMPARISON BETWEEN THOSE STATEMENTS AND THE TELEPHONE RECORDS, INCLUDING HIS OWN CONCLUSIONS ABOUT INCONSISTENCIES BETWEEN THE TWO. INEXPLICABLY, THERE WAS NO CHALLENGE OR OBJECTION FROM DEFENSE COUNSEL. DET. FORRESTER, BEING THE LEAD "COLD CASE" INVESTIGATOR WAS ALLOWED TO SIT THROUGH THE ENTIRE TRIAL, LISTENING TO ALL OF THE STATE'S OTHER WITNESSES AND THEN AT THE END, BEING THE STATE'S LAST WITNESS. WAS ALLOWED TO GIVE "CLOSING" ARGUMENTS ABOUT TWO DIFFERENT STATEMENTS MADE BY ME YEARS APART, PHONE RECORDS, TAPED INTERVIEWS, HIS PERSONAL FEELINGS ABOUT ME AND EVERYTHING ELSE THAT HE HAD HEARD OR LEARNED DURING THE TRIAL AND HIS OWN INVESTIGATING.

GROUND FOUR

PROSECUTORIAL MISCONDUCT OCCURRED DURING OPENING AND CLOSING ARGUMENTS. THESE STATEMENTS PREVENTED ME FROM GETTING A FAIR TRIAL AND PREJUDICED THE JURY AGAINST ME WHEN IN OPENING STATEMENTS THEY TOLD THE JURY THAT THEY WOULD HEAR "EYEWITNESS" TESTIMONY ON HOW I BROKE INTO THE VICTIM'S HOUSE THE NITE [SIC] OF THE MURDER. THERE WAS NEVER ANY "EYEWITNESS" TESTIMONY OF ANY SUCH THING NOR DID THE JUDGE OFFER ANY KIND OF INSTRUCTIONS TO THE JURY TO FIX THIS PROBLEM ONCE HE HEARD NO "EYEWITNESS" TESTIMONY TO THIS ALLEGED BREAK IN. THE EYEWITNESS MS. GLEN DID TESTIFY THAT I MIGHT HAVE BEEN MESSING WITH THE WINDOW, BUT THAT I NEVER ENTERED THE HOUSE THROUGH THE WINDOW OR ANY DOOR. MR. RUBIE SMITH TESTIFIED THAT I WAS RUNNING OUT OF THE HOUSE BUT THAT WAS, APPARENTLY, THE DAY BEFORE, DURING REBUTTAL CLOSING ARGUMENTS, WHEN THE DEFENSE HAD NO CHANCE TO REPLY, THE STATE TOLD THE JURY THAT I TRIED TO RAPE THE VICTIM

ON THE NITE [SIC] SHE WAS KILLED. EVEN THOUGH THE MEDICAL EXAMINER TESTIFIED THAT A ANAL, VAGINAL AND ORAL RAPE KIT CAME BACK NEGATIVE. THERE WAS NO PHYSICAL EVIDENCE INTRODUCED THAT THE VICTIM WAS SEXUALLY ASSAULTED. THE PROSECUTOR'S CLAIM WAS PURELY SPECULATIVE INVENTION DESIGNED TO AROUSE THE PASSION OF THE JURY AGAINST ME. THESE WERE ATTEMPTS TO MAKE ME DEFEND MYSELF AGAINST TWO MORE FELONIES THAT I HAD NOT BEEN INDICTED FOR. THE PROSECUTOR ALSO IMPROPERLY VOUCHED FOR THE CREDIBILITY OF ITS OWN WITNESS'S DOING SO BY, AGAIN, INVENTING EVIDENCE. SPEAKING OF HEARSAY TESTIMONY FROM JEANNINE LAMB, AND RUBIN SMITH. THE PROSECUTOR SAID "WE WOULD SUBMIT TO YOU SHE'S COLD STONE SOBER WHEN SHE HEARS FROM ME AND THE SANE THING FROM MR. SMITH EVEN WHEN MS. LAMB SAID THEY WERE NOT. TESTIMONY BY LAMB, AND SPECIALLY [SIC] SMITH, WAS CRITICAL TO THE STATE'S CASE. THE ADDED CHARGES IN THE OPENING AND REBUTTAL ARGUMENTS WERE DESIGNED TO DEPRIVE ME OF A FAIR TRIAL. THE INVENTED EVIDENCE WITH VOUCHING FOR MS. LAMB AND MR. SMITH WAS DESIGNED TO BOLSTER THE TESTIMONY. THE PROSECUTOR MAY STRIKE HARD BLOWS, HE IS NOT AT LIBERTY TO STRIKE FOUL ONES. I DON'T UNDERSTAND WHY NONE OF THIS DREW OBJECTION FROM MY DEFENSE COUNSEL. THERE'S NO WHY THAT CAN BE CHALKED UP TO TRIAL STRATEGY.

GROUND FIVE

THE COURT'S IMPROPER JURY INSTRUCTIONS, TELLING THE JURY "THEIR" JOB WAS TO DETERMINE MY "GUILT OR INNOCENT" VIOLATED RIGHT TO A FAIR TRIAL. THE JURY'S JOB IS NO SUCH THING. THEIR SOLE FUNCTION AFTER DETERMINING CREDIBILITY OF THE EVIDENCE THEY HEARD AND SAW IN THE COURTROOM AND THROUGH EXHIBITS, WAS TO DETERMINE WHETHER THE STATE HAD PROVEN EACH AND EVERY ELEMENTS OF THE OFFENSE BEYOND A REASONABLE DOUBT. THE COURT'S INSTRUCTIONS TO THE JURY MADE THEM DETERMINE WHETHER OR NOT THEY BELIEVED IN MY GUILT OR INNOCENCE WITH HIS MISSTATEMENT OF THE JURY MADE THEM TO LOSE THEIR WAY. MY RIGHT TO EFFECTIVE COUNSEL WAS VIOLATED WHEN MY DEFENSE COUNSEL DIDN'T MAKE A TIMELY OBJECTION AS THEY DIDN'T DO WITH A LOT OF MY TRIAL. THE JURY WAS GROSSLY MISINFORMED OF THEIR FUNCTION AND DUTY IN THIS TRIAL! THE JUDGE SHOULD HAVE TOLD THE JURY, THAT IT'S THEIR JOB TO DETERMINE WHETHER OR NOT THE EVIDENCE HAS PROVED MY GUILT OR INNOCENCE! THE JURY WAS GROSSLY MISINFORMED OF THEIR FUNCTION AND DUTY IN THIS TRIAL.

GROUND SIX

STATE'S WITNESS AND CORONER DR. CYNTHIA BEISSER TESTIFIED TO HER ESTIMATED TIME OF DEATH AS BEING FROM 12 TO 15 HOURS BEFORE SHE ARRIVED AT THE SCENE. SHE TESTIFIED REPEATEDLY THAT THIS WAS IN HER "OPINION" AND BEST "GUESS". DR. BEISSER TESTIFIED THAT SHE COULDN'T DETERMINE THE TIME WITH ANY REASONABLE DEGREE OF SCIENTIFIC CERTAINTY. DR. BEISSER COULDN'T EXPLAIN HOW SHE CAME TO HER "OPINION" REGARDING THE TIME OF DEATH. THE PROSECUTOR SPECIFICALLY ASKED IF HER

OBSERVATION OF "SKIN SLIPPAGE", COUPLED WITH HER KNOWLEDGE, TRAINING AND EXPERIENCE AS A FORENSIC PATHOLOGIST "WOULD PERMIT HER TO ESTIMATE A GENERAL TIME OF DEATH" FOR THE VICTIM. AGAIN, SHE SAID SHE COULD NOT DO IT "SCIENTIFICALLY". YET SHE OFFERED HER "OPINION". THEY WERE FLY EGGS AND LARVE ON THE BODY THAT WOULD HAVE "SCIENTIFICALLY" DETERMINED A MUCH MORE ACCURATE AND NARROWED WINDOW FOR THE TIME OF DEATH, IF SHE HAD BEEN COMPETENT ENOUGH TO DO HER JOB. THE STATE NEEDED THE WIDEST WINDOW OF DEATH IN ORDER FOR THEIR CASE TO WORK AGAINST ME. THE FAILURE OF DEFENSE COUNSEL TO CHALLENGE DR. BEISSER'S "OPINION" OR HUNCH WAS BOTH WOEFULLY DEFICIENT AND HIGHLY PREJUDICIAL. THIS WIDE WINDOW FOR THE TIME OF DEATH WAS ALLOWED TO GO UNCHALLENGED EVEN THOUGH HER "OWN" AUTOPSY REPORT AND THE CORONER'S OFFICE'S INVESTIGATION REPORT CONTAINED FACTS THAT SUGGESTED A SHORTER POST-MORTEM INTERVAL (THE TIME BETWEEN THE DEATH AND THE PATHOLOGIST'S EXAMINATION) NO ONE EVER ASKED DR. BEISSER'S BASIS FOR HER CONCLUSIONS (OPINION). DR. BEISSER HAD A CAUSE OF DEATH RULING REVERSED ON A CARLTON BENTON SHE HAD MADE IN 2004 FROM NATURAL TO HOMICIDE BY THE FEDERAL GOVERNMENT IN 2010. SHE DID HIS AUTOPSY THE SAME WEEK AS THE VICTIM IN MY CASE.

GROUND SEVEN

THE TRIAL COURT IMPROPERLY INHIBITED ME FROM CROSS-EXAMINING WITNESS JEANNINE LAMB ABOUT WHETHER WITNESS AND LIVE IN BOYFRIEND RUBIN SMITH HAD A DRUG HABIT OR, WHETHER SHE HAD DONE DRUGS WITH SMITH THE NITE [SIC] OF HIS ALLEGED SIGHTING OF ME THE NITE [SIC] OF THE MURDER. THE TRIAL COURT IMPROPER LIMITING OF DEFENSE COUNSEL'S CROSS-EXAMINATION OF STATE WITNESSES DEPRIVED ME OF A FAIR TRIAL.

GROUND EIGHT

A CUMULATIVE ERROR REQUIRES A NEW TRIAL

GROUND NINE

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT OF GUILTY OF MURDER. THERE WAS NOT ONE PIECE OF DIRECT EVIDENCE PLACING ME AT THE MURDER OR THE CRIME SCENE.

GROUND TEN

JURY'S VERDICT IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

GROUND ELEVEN

THE JUDGE IMPROPERLY ALLOWED HEARSAY TESTIMONY FROM TESHAUNA ISAAC OVERRULING OUR OBJECTION.

-13-

GROUND TWELVE

THE JUDGE ASKED THE JURY DID THEY HAVE THE TIME TO READ
THEIR JURY INSTRUCTION'S HAND BOOK. THE JURY REPLIED NO. THE
JUDGE SAID DON'T WORRY, YOU'LL HAVE PLENTY OF TIME TO READ
THEM THROUGH OUT THE TRIAL. HE NEVER WENT BACK AND ASKED
IF THEY HAD READ THEIR JURY INSTRUCTIONS YET. EVEN AFTER HE
HIMSELF GAVE FAULTY INSTRUCTIONS CAUSED THEM TO LOSE THEIR
WAY.

GROUND THIRTEEN

I WAS PROVIDED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN
THEY (1) FAILED TO OBJECT TO THE VENIRE AFTER THE ONLY
AFRICAN-AMERICAN JUROR WAS EXCUSED (2) FAILED TO OBJECT TO
THE CORONER'S TESTIMONY REGARDING TIME OF DEATH (3) FAILED
TO OBJECT TO PROSECUTORIAL MISCONDUCT (4) FAILED TO OBJECT
TO HEARSAY TESTIMONY (5) FAILED TO OBJECT TO IMPROPER JURY
INSTRUCTIONS REGARDING JURY'S RULE [SIC] MAKING IT IMPOSSIBLE
FOR ME TO DEFEND MYSELF AND GET A FAIR TRIAL. (6) FAILED TO
OBJECT TO THE TESTIMONY OF DET. STEVE FORRESTER. (7) COUNSELS
FAILURES TO OBJECT WERE OBJECTIVELY DEFICIENT AND
PREJUDICIAL. (8) THERE WAS NOT ONE PIECE OF DIRECT EVIDENCE
LINKING ME TO THIS MURDER. NOR WAS THERE ANY EYEWITNESS
WHO SAY'S THEY SAW ME COMMIT THIS MURDER NOR DID I CONFESS
TO IT.

ECF Dkt. #1.

## IV.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits
of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United
States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default
and exhaustion of remedies, operate to limit access to review on the merits of a constitutional
claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).
However, the Supreme Court has also held that it would be in the interests of the parties and the
courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not
even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*,
822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was
plainly meritless, the state had not addressed exhaustion, and disposition of the case would not
offend federal-state comity).

-14-

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. §2244(d)(1).  The AEDPA statute of limitations is not at issue in this case.

### B.    Exhaustion of State Remedies

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated.  *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims.  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law.  *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993) cert. denied, 509 U.S. 907 (1993)(quotation omitted).  In *Harris v. Lafler*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a petition that contains unexhausted claims:

-15-

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, *id*. at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

553 F.3d 1028, 1031-32  (6th Cir. 2009).  The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist."  *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds*, *Fay v. Noia*, 372 U.S. 391 (1963).  A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted.  *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

### C.  **Procedural Default**

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).   In these cases, "the state judgment rests on independent and adequate state procedural grounds."  *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment."  *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v.Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition.  *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

-16-

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

(1)     whether the petitioner failed to comply with an applicable state procedural rule;

(2)     whether the state courts actually enforced the state procedural sanction;

(3)     whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)(state procedural bar that is not "firmly established and regularly followed" cannot serve  to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000)(even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000)(where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

-17-

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision.  *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 751.  "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation.  *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985).  If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice.  *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the Court's review of Petitioner's claims.

## V.  STANDARD OF REVIEW

The undersigned further recommends that the Court find that the AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28  U.S.C. § 2254 on January 20, 2012, well after the act's effective date of April 26, 1996.  *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for a writ of habeas corpus.  The AEDPA provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

    (1)       resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)       resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Further, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

    The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

    A.       Decisions of lower federal courts may not be considered.

    B.       Only the holdings of the Supreme Court, rather than its dicta, may be considered.

    C.       The state court decision may be overturned only if:

        1.       It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

        2.       the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

3.    'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

4.    the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.    Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.    Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).   The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).   The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672,

-20-

676, n.4 (6ᵗʰ Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The United States Supreme Court recently observed:

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 786-787 (2011).

## VI.  ANALYSIS

### A.  Procedural Default

Respondent contends that Petitioner is procedurally barred from raising the constitutional issues raised in Grounds One through Four, Six, and Eight, Ten through Twelve.  Respondent relies upon several methods of procedural default with respect to each of the grounds, which are addressed in detail below.

First, to satisfy the exhaustion requirement, a claim  must be "fairly presented" to the state courts, meaning that the petitioner must have asserted both the factual and legal bases for the claims in the state courts. See *McMeans,* supra, at 681; see also *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.2006)(citing *McMeans*). A claim must also be presented to the state courts as a federal constitutional issue.  See *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir.1984).  The burden is on the prisoner to prove exhaustion.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.1994).

Procedural default occurs when the petitioner fails to fairly present his federal constitutional claim to the state courts in the manner required by state law.  *Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Ernie v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).  The failure to present a claim constitutes a waiver of the argument, unless the petitioner can present cause for the default and actual prejudice from the constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986);  *Sawyer v. Whitley*, 505 U.S. 333, 338, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

"Fairly presenting" a claim requires more than just mentioning it in passing. Rather, a petitioner must present both the factual and legal basis for his claims to the state court. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir.2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir.2003)(even if there were "variations in the legal theory or factual allegations urged in [the claim's] support," the petitioner must have presented state courts with a claim similar enough "that the ultimate question would have been the same." *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir.2008). Neither a "somewhat similar state-law claim," *Anderson v. Harless*, 459 U.S. 4, 6, (1982), nor a general allegation of a fair trial or due-process violation is enough. *McMeans*, supra, at 681.

It is clear that Petitioner did not rely upon any constitutional case law in his appellate brief with respect to the claims raised in Grounds One (hearsay testimony of Smith) and Two (hearsay testimony of Hodrick and Glenn), which were addressed in his first assignment of error before the Sixth District, nor did the Sixth District undertake any constitutional analysis of his claims. The first assignment of error was raised and analyzed purely as a matter of state law. Furthermore, Petitioner has not asserted any cause for his failure to raise his constitutional claim in his direct appeal nor has he established a fundamental miscarriage of justice.

The same is true for the claim raised in Ground Three (opinion testimony of Forrester). Although Petitioner made a passing reference to his Sixth and Fourteenth Amendment rights in his second assignment of error before the Sixth District, he did not cite any federal case law. Moreover, the Sixth District, in addressing the second assignment of error, did not undertake any constitutional analysis, relying exclusively upon Evid.R. 701 and case law interpreting the evidence rule. Accordingly, the undersigned recommends that the Court find that the claim asserted in Grounds One through Three are procedurally defaulted due to Petitioner's failure to challenge the constitutionality of the admission of the evidence in his direct appeal.

Next, when a petitioner fails to comply with an adequate and independent state procedural rule when presenting a federal constitutional claim, the petitioner may be barred from federal court review of his claim. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In Ohio, failure to raise a contemporaneous objection to error in the trial court "is an adequate and independent state ground to bar federal habeas review absent a showing of cause and

-22-

prejudice." *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir.2000) (citing *Engle v. Isaac*, 456 U.S. 107, 124–29, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).

Here, Petitioner's trial counsel did not object to the alleged prosecutorial misconduct alleged in Ground Four, or the alleged improper jury instruction in Ground Five.  As a consequence, the Sixth District reviewed Petitioner's prosecutorial misconduct claim and jury instruction claim, which were asserted as his third and fourth assignments of error, for plain error.  However, the state court's plain error review did not constitute a waiver of the procedural default.  See *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir.2000).  Petitioner has not asserted any cause for his failure to raise his constitutional claim in his direct appeal[2] nor has he established a fundamental miscarriage of justice. Accordingly,  the undersigned recommends that the Court find that Grounds Four and Five have no merit.

Finally, a claim must be fairly presented at every stage of the state appellate process.  *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir.2009).  The substantive claims in Grounds Six (coroner's testimony), Eleven (Teshauna Isaac testimony), and Twelve (jurors failure to read the jury instruction handbook) were not raised at all in his second direct appeal.  Petitioner offered no explanation for his failure to raise those issues in his second direct appeal nor did he establish a fundamental miscarriage of justice.  Likewise, the failure to present an issue to the state supreme court on discretionary review constitutes procedural default.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).   Here, Petitioner did not raise the issues  addressed in Grounds Four (prosecutorial misconduct), Eight (cumulative error) and Ten (manifest weight) before the Ohio Supreme Court, nor did he assert any cause for his failure to do so or establish a fundamental

---

[2]Ineffective assistance of counsel can constitute cause to excuse a procedural default.  See *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir.2000).  Because the undersigned recommends that the Court find that Groung Thirteen (Ineffective Assistance of Counsel) has no merit, see *infra.,* Petitioner has not demonstrated cause.

miscarriage of justice.  Accordingly, the undersigned recommends that the Court find that Grounds Four, Six, Eight, Ten, Eleven, and Twelve are procedurally defaulted.[3]

Beyond *Maupin*, the Court can still consider Petitioner's constitutional arguments if the Court determines that  it is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent..." *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed. 2d 397 (1986).  The Sixth Circuit Court of Appeals explained that the "actual innocence" exception, or the "fundamental miscarriage of justice" gateway, is open to a petitioner who submits new evidence showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004), quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)(quoting *Murray*, 477 U.S. at 496. The Sixth Circuit held that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*  Petitioner has produced no new evidence to carry his burden in that respect.  Moreover, perfunctory claim of actual innocence should fail. Therefore, the only grounds that are not procedurally barred are Grounds Seven (cross-examination of Lamb), Nine (sufficiency of the evidence), and Thirteen (ineffective assistance of counsel).  The undersigned will also address Grounds One, Two, and Three in the event that the Court may determine that the are not procedurally barred.

### B.        Grounds One and Two: Admission of Hearsay

GROUND ONE

JUDGE IMPROPERLY ADMITTED HEARSAY FROM RUBIN SMITH WHEN HE ALLOWED MR. SMITH TO TESTIFY THAT THE VICTIM CLAIMED TO HAVE TOLD HIM THAT I "WAS" TALKING ABOUT KILLING HER. SINCE

---

[3]In addition to being procedurally barred, Grounds Eight and Ten have no merit.  The cumulative weight of alleged constitutional trial errors in a state prosecution does not warrant federal habeas relief; because there is no clearly established federal law permitting or requiring the cumulation of distinct constitutional claims to grant habeas relief.  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.2005). As such, Ground Eight is a non-cognizable claim.  Ground Nine is predicated upon Petitioner's claim that his convictions are against the manifest weight of the evidence.  Such a claim is likewise not cognizable on federal habeas review. *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir.1985); *Walker v. Timmerman–Cooper*, No. 1:05CV103, 2006 WL 3242101 (S.D.Ohio Oct.5, 2006).

MR. SMITH DIDN'T HEAR THIS "ALLEGED" THREAT HIMSELF. THAT WOULD MAKE HIS TESTIMONY DOUBLE HEARSAY. NOR WOULD IT FALL UNDER THE "STATE OF MIND" EXCEPTION.

GROUND TWO

IMPROPER TESTIMONY WAS ALLOWED BY SATRA HODRICK WHEN SHE TESTIFIED THAT THE VICTIM'S NEIGHBOR, SEVEQUA GLEN TOLD THE VICTIM THAT SHE SAW ME BREAK INTO HER HOUSE. THE VICTIM THEN TOLD MS. HODRICK AT A DINNER THAT TOOK PLACE WELL BEFORE MS. KEY EVEN LEARNED ABOUT THIS ALLEGED BREAK-IN. IN CHAMBERS, THE JUDGE SAID HE'D WILL ALLOW THE TESTIMONY AS "EXCITED UTTERANCE" IF THE STATE COULD PRODUCE A "EYEWITNESS" TO TESTIFY ABOUT SEEING ME BREAKING INTO THE HOUSE AS THIS WOULD CAUSE THE STARTLING EVENT AGAINST ME FOR THE "EXCITED UTTERANCE" RULE TO COME INTO PLAY. THE EYEWITNESS, MS. GLEN TESTIFIED THAT SHE SAW ME EARLIER IN THE NITE [SIC] MESSING WITH THE WINDOW, BUT THAT I DID NOT ENTER THE HOUSE. MS. GLEN ALSO TESTIFIED THAT NOT ONLY WAS SHE NOT ALARMED TO SEE ME AT THE HOUSE OR TO BE "MESSING" WITH A WINDOW. BUT SHE "NEVER" TOLD THE VICTIM, HER GRANDMOTHER WITH WHOM SHE LIVED WITH OR ANYONE ELSE THAT I WAS AT THE HOUSE OR MESSING WITH ANYTHING, LET LONE A WINDOW. MS. GLEN'S TESTIMONY OF NOT WITNESSING ME BREAK INTO THE VICTIMS HOUSE, NOR TELL ANYONE THAT I WAS EVEN THERE, KILLS ANY REASON THE JUDGE COULD USE TO JUSTIFY LETTING THE HEARSAY, DOUBLE HEARSAY AND THE HEARSAY-WITH-IN HEARSAY IN AS EXCITED UTTERANCE OR THE STATE OF MIND EXCEPTION, THE JUDGE DID NOT GO BACK AND INSTRUCT THE JURY TO DISREGARD MS. HODRICK'S TESTIMONY AS HEARSAY ONCE HE LEARNED THE STATE DIDN'T HAVE AN EYEWITNESS TO TESTIFY TO ME BREAKING INTO THE HOUSE. THE STATE CAN'T ASSUME THAT THEY WOULD'VE GOTTEN A GUILTY VERDICT AGAINST ME WITH JUST THE CIRCUMSTANTIAL EVIDENCE THEY HAD LEFT.

In Grounds One and Two, Petitioner contends that the trial court improperly admitted hearsay evidence at trial. Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. ___, 131 S.Ct. 13, 178 L.Ed.2d 276 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983); *Bell v. Arn*, 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir.1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir.2007); *Bugh v. Mitchell*, 329 F.3d 496 (6th Cir.2003), citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.2000). The Supreme Court has also repeatedly emphasized that this standard creates an extremely high bar for a bare due-process objection to admitted evidence. See, e.g., *Perry v. New Hampshire*, 132 S.Ct. 716, 723 (2012) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)). To determine whether the admission or exclusion of evidence denied fundamental due process rights, a court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir.1994).

The Sixth District provided the following analysis of the hearsay offered at trial, and the exceptions to the hearsay rule that justified the admission of the evidence:

{¶ 30} In support of his first assignment of error, appellant asserts that the trial court improperly allowed into evidence two hearsay statements. The first statement that appellant challenges was made by Key's friend and neighbor, Rubin Smith, who testified that Key told him that appellant said he would kill her. According to Smith's testimony, Key came to him while she was talking to appellant on her cell phone and, while still on the phone, asked Smith to tell her father that appellant was talking about killing her. Smith testified: "She asked me I appreciate it if you tell my father something because something bad going to happen, and then I asked her what. She said, well, my boyfriend, he was talking about killing me." Over appellant's objection, the trial court admitted the statement based on the "state of mind" exception to hearsay under Evid.R. 803(3).

{¶ 31} Appellant argues that the statement should not have been admitted under the state-of-mind exception to the hearsay rule. For the reasons set forth below, this court finds that Smith's statement was properly admitted as an exception to hearsay, although it should have been admitted as an excited utterance pursuant to Evid.R. 803(2).

-26-

{¶ 32} A statement other than one made by the declarant, offered in evidence to prove the matter asserted, is hearsay pursuant to Evid.R. 801(C) and is generally inadmissible. Evid.R. 802. There are numerous exceptions to the rule, however, as set forth in Evid.R. 803 and 804. As with other evidentiary rulings, the determination whether hearsay statements are subject to exception rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 92. An abuse of discretion is more than an error in judgment or a mistake of law; it connotes that the court's attitude is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

{¶ 33} Evid.R. 803(2) provides an exception to the rule excluding hearsay if the out-of-court statement was an excited utterance—that is, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 34} In *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, the Ohio Supreme Court established a four-part test to determine whether a hearsay statement is admissible under Evid.R. 803(2). *Id.* at paragraph one of the syllabus, approving and following Potter v. Baker (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus. Under this test, the proponent of the statement must establish that (1) there was an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have had an opportunity to personally observe the startling event. *Id.*

{¶ 35} In this case, we find that Key's experience of hearing appellant threaten to kill her was startling enough to cause her to go immediately to Smith and relay the information to him. She was still under the "nervous excitement" created by the threats when she spoke to Smith because she was still on the phone with appellant, and what she communicated to Smith clearly related to the startling event. Finally, Key clearly had an "opportunity to observe personally the matters asserted" in her statement by virtue of hearing appellant's threatening words over the phone.

{¶ 36} Based on the foregoing, we conclude that the trial court properly ruled that Smith's statement was admissible as a hearsay exception, although we find that the statement qualifies as an excited utterance under Evid.R. 803(2) rather than as a state-of-mind exception. We are able to come to this resolution based on the decision in *State v. Peagler* (1996), 76 Ohio St.3d 496, 501, 668 N.E.2d 489, which holds that an appellate court may decide an issue on grounds different from those determined by the trial court, so long as the evidentiary basis on which the appellate court decides a legal issue was adduced before the trial court and made a part of the record thereof. The record in this case satisfies the standard required by *Peagler*. We therefore find that appellant's first argument under his first assignment of error is without merit.

{¶ 37} In his second argument in support of his claim that the trial court improperly admitted hearsay statements, appellant cites the testimony of Satyra Hodrick that Key told her that a neighbor, Sevequa Glenn, said she saw appellant break into Key's house that evening. Key had been gone for several hours during the evening having dinner with Hodrick and some other friends. Appellant asserts that Hodrick's testimony constitutes inadmissible double hearsay.

{¶ 38} Pursuant to Evid.R. 805, hearsay within hearsay is admissible if each part of the combined statements conforms to an exception to the hearsay rule. Therefore, in order for Hodrick's statement to be admissible, Glenn's statement to Key, and Key's subsequent statement to Hodrick, must both fall under an exception to the hearsay rule.

{¶ 39} The admissibility of this testimony was addressed in a side-bar discussion prior to Hodrick's testimony. At that time, the trial court ruled that Glenn's telling Key about the break-in when Key returned from dinner and Key's call to Hodrick after she talked to Glenn both were excited utterances. After the trial court's ruling, Hodrick testified that Key called her shortly before midnight on the night of her death and told Hodrick that her neighbor had said that appellant had broken into her house while Key and Hodrick were out to dinner. Hodrick testified that Key was upset when she called.

{¶ 40} As explained above, in order for testimony to be admissible under Evid.R. 803(2) as an "excited utterance," there must be a startling occurrence sufficient to still the reflective faculties of the declarant and a statement made nearly contemporaneously with the startling event that relates to that event and concerns things that the declarant had an opportunity to personally observe. *State v. Wallace* (1988), 37 Ohio St.3d 87, 89, 524 N.E.2d 466.

{¶ 41} As to the statement Glenn made to Key, Glenn's testimony that she saw appellant "messing" with one of Key's downstairs windows for about 30 minutes would be a startling event for most people. It clearly bothered Glenn enough to take the initiative to tell Key when she saw Key return home that night. Further, we note that there is no specific amount of time after which a statement can no longer be considered an excited utterance; the statement simply may not be the result of reflective thought. *State v. Hoehn*, 9th Dist. No. 03CA0076–M, 2004-Ohio-1419, 2004 WL 573844, ¶ 14, citing *State v. Taylor* (1993), 66 Ohio St.3d 295, 300–301, 612 N.E.2d 316. Our review of the record fails to reveal any testimony to indicate that Glenn's statement was the result of reflective thought. Finally, Glenn's statement was directly related to her personal observation of appellant's conduct.

{¶ 42} Upon review of the foregoing, we find that the trial court did not abuse its discretion by allowing Glenn's statement as an excited utterance.

{¶ 43} As to Key's statement to Hodrick, we find that the statement also was properly admitted as an excited utterance. Hodrick testified that Key told her that a neighbor had said that appellant had broken into her home through one of the windows. Hodrick indicated that Key had been upset to learn what her neighbor had seen. The record indicates that Key's statement to Hodrick was made nearly contemporaneously with her being told by Glenn that appellant had broken into the home. There is no indication that Key's statement to Hodrick was the result of reflective thought; it appears that Key was startled to have learned about what had occurred. The trial court clearly determined that Hodrick's testimony that Key had been upset after hearing what had happened at her house that evening qualified as an excited utterance. We find that the trial court, after hearing Hodrick's testimony, was in the best position to make a determination whether Key's statement was an excited utterance.

{¶ 44} Based on the foregoing, we find that the trial court did not abuse its discretion by allowing the disputed testimony as exceptions to the hearsay rule, and accordingly, appellant's first assignment of error is not well taken.

The hearsay at issue was admissible under a clearly established exception to the rule against hearsay.  Even assuming that admission of the testimony of Smith and Hodrick constituted a violation of state law, the evidence bore "persuasive assurances of trustworthiness,"  see *Turpin, supra,* insofar as their testimony was consistent.  Finally, the evidence was not critical because there was considerable additional evidence offered at trial to establish that Petitioner murdered Key.  Accordingly, in the event that the Court finds that Grounds One and Two are not procedurally barred, the undersigned recommends that the Court find that Grounds One and Two are meritless.

### C.    Ground Three: Admission of Opinion Testimony

IMPROPER OPINION EVIDENCE TESTIMONY AND ARGUMENT BY THE STATE'S WITNESS DETECTIVE STEVE FORRESTER DEPRIVED ME OF A FAIR TRIAL. A GREAT DEAL OF THE PURPORTED STRENGTH OF THE STATE'S CASE RESTED UPON ALLEGED INCONSISTENCIES BETWEEN STATEMENTS MADE BY ME AND EVIDENCE CONTAINED IN TELEPHONE RECORDS OBTAINED AND OFFERED BY THE STATE WITNESSES. RATHER THAN SIMPLY ADMIT THE RECORDS AND MY STATEMENT, THE STATE LED COLD CASE DET. FORRESTER THROUGH HIS OWN ANALYSIS AND COMMENTARY OF A COMPARISON BETWEEN THOSE STATEMENTS AND THE TELEPHONE RECORDS, INCLUDING HIS OWN CONCLUSIONS ABOUT INCONSISTENCIES BETWEEN THE TWO. INEXPLICABLY, THERE WAS NO CHALLENGE OR OBJECTION FROM DEFENSE COUNSEL. DET. FORRESTER, BEING THE LEAD "COLD CASE" INVESTIGATOR WAS ALLOWED TO SIT THROUGH THE ENTIRE TRIAL, LISTENING TO ALL OF THE STATE'S OTHER WITNESSES AND THEN AT THE END, BEING THE STATE'S LAST WITNESS. WAS ALLOWED TO GIVE "CLOSING" ARGUMENTS ABOUT TWO DIFFERENT STATEMENTS MADE BY ME YEARS APART, PHONE RECORDS, TAPED INTERVIEWS, HIS PERSONAL FEELINGS ABOUT ME AND EVERYTHING ELSE THAT HE HAD HEARD OR LEARNED DURING THE TRIAL AND HIS OWN INVESTIGATING.

In his third assignment of error, Petitioner asserts that the trial court erred in admitting the opinion testimony of Detective Steve Forrester.  The Sixth District provided the following analysis of Forrester's testimony:

{¶ 45} As his second assignment of error, appellant asserts that the trial court improperly admitted the testimony of Detective Forrester, which appellant claims was improperly argumentative and constituted closing argument rather than evidence. Appellant cites the detective's testimony as to appellant's phone records the night Key was murdered, arguing that the analysis of the records was argumentative and outrageous. In his testimony, Forrester commented on inconsistencies between statements made by appellant when questioned by the police and facts as shown by appellant's phone records. Appellant argues that the testimony amounted to improperly admitted opinion that appellant lied on several occasions about his whereabouts during the time surrounding the murder.

-29-

{¶ 46} Evid.R. 701 provides that when a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences that are (1) rationally based on the witness's perception and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. *State v. Bleigh*, 5th Dist. No. 09–CAA–03–0031, 2010-Ohio-1182, 2010 WL 1076253, ¶ 106.

{¶ 47} The record before us reflects that Forrester testified as to his investigation of the case, which involved interviews with appellant. Forrester further testified about inconsistencies between appellant's statements concerning his whereabouts during the murder and the evidence derived from appellant's cell-phone records. The detective's perception of appellant's demeanor during interviews and the statements appellant made were helpful to the jury's understanding of the significance of the phone records. We therefore find that Forrester's testimony was proper lay-opinion testimony under Evid.R. 701 and was rationally related to his review of the phone records and the statements appellant made to the police. We further find that Forrester's testimony is improperly characterized as argumentative by appellant.

{¶ 48} Based on the foregoing, appellant's second assignment of error is not well taken.

First, the Sixth District correctly concluded that Forrester's testimony constituted opinion testimony, and that his testimony fell within the bounds of the limits on such testimony. Furthermore, as previously stated, evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper*, supra. Based upon the substantial evidence adduced at trial, the admission of Forrester's testimony was neither critical  to Petitioner's conviction, nor was it prejudicial in the sense that he would not otherwise have been convicted in the absence of the testimony.  Accordingly, in the event that the Court finds that Ground Three is not procedurally barred, the undersigned recommends that the Court find that Ground Three has no merit.

### D.      Ground Seven: Cross-examination of Lamb

THE   TRIAL   COURT   IMPROPERLY   INHIBITED   ME   FROM CROSS-EXAMINING WITNESS JEANNINE LAMB ABOUT WHETHER WITNESS AND LIVE IN BOYFRIEND RUBIN SMITH HAD A DRUG HABIT OR, WHETHER SHE HAD DONE DRUGS WITH SMITH THE NITE [SIC] OF HIS ALLEGED SIGHTING OF ME THE NITE [SIC] OF THE MURDER. THE TRIAL   COURT   IMPROPER   LIMITING   OF   DEFENSE   COUNSEL'S CROSS-EXAMINATION OF STATE WITNESSES DEPRIVED ME OF A FAIR TRIAL.

The Sixth District provided the following analysis of Petitioner's sixth assignment of error, predicated upon the trial court's limitation of Petitioner's cross-examination of Jeannine Lamb:

{¶ 69} In his sixth assignment of error, appellant asserts that the trial court improperly limited the cross-examination of witness Jeannine Lamb by the defense,

-30-

thereby violating appellant's Sixth Amendment right to confront witnesses against him. Appellant argues that counsel was attempting to impeach the testimony of Rubin Smith through its cross-examination of Lamb. Rubin Smith, Key's next-door neighbor, had testified as to his observations on the night of the murder. While cross-examining Smith as to what he saw while looking out his window on the night of the murder, defense counsel asked Smith whether he had been drinking or taking any substance "that would make it difficult for [him] to see anything." Smith responded that he had not. Later, while cross-examining Lamb, who lived with Smith at the time of the murder, defense counsel asked Lamb whether Smith had a drug habit. The state objected, and the trial court sustained the objection. The trial court explained that the attempt at impeachment was improper because Smith had already testified on that point and because Smith could not be cross-examined on Lamb's testimony as to his drug usage. Appellant now argues that Lamb's answer to the question regarding whether Smith had a drug habit would have been relevant to Smith's credibility.

{¶ 70} It is well settled that " '[t]he scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge.' " *State v. Lundgren* (1995), 73 Ohio St.3d 474, 487, 653 N.E.2d 304, quoting *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 407 N.E.2d 490. Thus, when the trial court allows or disallows certain testimony, the order or ruling of the court will not be reversed absent a clear and prejudicial abuse of discretion. *O'Brien* at 163.

{¶ 71} Counsel's attempt to question Lamb about Smith's drug use was intended to discredit Smith's character. However, pursuant to Evid.R. 608(B), specific instances of a witness's conduct, for the purpose of attacking or supporting his character for truthfulness (other than conviction of crime as provided in Evid.R. 609), may not be proven by extrinsic evidence such as Lamb's testimony.

{¶ 72} Defense counsel's proposed line of questioning would not have assisted the jury in evaluating Smith's credibility because Smith had already been asked on cross-examination whether he had used any substances the night of the murder. Smith responded that he had not, and defense counsel did not pursue the matter. We are unable to find that the trial court's ruling limiting the cross-examination of Lamb as to Smith's possible drug use was unreasonable, arbitrary, or unconscionable. Accordingly, the trial court did not abuse its discretion, and appellant's sixth assignment of error is not well taken.

The Confrontation Clause of the Sixth Amendment bestows upon the criminal defendant the right to confront the witnesses against him, and the opportunity to cross-examine such witnesses: "Indeed, [t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (alteration in the original) (internal quotation marks and citation omitted). That said, the criminal defendant's right to cross-examine witnesses is not limitless:

[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we

-31-

> observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* at 679, 106 S.Ct. 1431 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)).  Thus, a state trial court has discretion to limit cross-examination. Moreover, "[w]here it is merely the extent of cross-examination that is limited, the trial judge retains a much wider latitude of discretion." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir.1989).

Where the trial court limits the extent of cross-examination, the inquiry for the reviewing court is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Id.*  The Sixth Circuit has emphasized the jury's access to the relevant facts under this inquiry:

> [T]his Court has recognized that the bounds of the trial court's discretion are exceeded when the defense is not allowed to plac[e] before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred[.] This well-settled principle protects the defendant's right on cross-examination to develop facts which might undermine a government witness's credibility.

*Id.* (internal quotation marks and citation omitted).  Conversely, the Sixth Circuit has found "no authority for finding a constitutional violation where cross-examination of a key government witness was only partially limited and where the questioning that was barred was not aimed at eliciting any additional facts." *Id.* at 166.  If the jury did not have adequate information, such that "there is indeed a denial or significant diminution of cross-examination that implicates the Confrontation Clause, the Court applies a balancing test, weighing the violation against the competing interests at stake." *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir.2000)(citation omitted).

Here, Petitioner sought to elicit testimony from Lamb regarding Smith's drug use. Petitioner had an opportunity to cross-examine Smith, and, therefore, the jury had adequate information regarding his drug use.  Accordingly,  the undersigned recommends that the Court find that Ground Seven has no merit.

### E.        Ground Nine: Sufficiency of the Evidence

> THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT OF GUILTY OF MURDER. THERE WAS NOT ONE PIECE OF DIRECT EVIDENCE PLACING ME AT THE MURDER OR THE CRIME SCENE.

The due process clause of the Fourteenth Amendment requires that a criminal conviction be based upon proof beyond a reasonable doubt as to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard for determining sufficiency of the evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reaching its determination as to the sufficiency of the evidence, a court may not substitute its determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. See *id.*; see also *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir.1983).

To determine whether the state court unreasonably applied the sufficiency-of-the-evidence standard of *Jackson v. Virginia*, * * * "[f]irst, [the Court] must ask whether the evidence itself was sufficient to convict.... [and] [t]he inquiry ends if [the Court] determines that there was sufficient evidence." *Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir.2010) (citation omitted). Second, "[i]f [the Court] find[s] that the evidence is insufficient to convict, [the Court] must then apply AEDPA deference and ask whether the state court was 'objectively unreasonable' in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt." *Id.* (citation omitted). The result of this double deference is that "habeas corpus relief is appropriate based on insufficient evidence only where we find, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir.2007). On habeas review, federal courts must assume that the jury "resolve[d] conflicts in the testimony," "weigh[ed] the evidence," and drew "reasonable inferences" therefrom. *Jackson*, supra, at 319. A court should interfere with a jury verdict only to the extent necessary to guarantee the fundamental protections of due process of law.

The Sixth District provided the following analysis of Petitioner's sixth assignment of error based upon the sufficiency of the evidence and the manifest weight of the evidence:

> {¶ 75} Sufficiency of the evidence is a question of law that asks whether the evidence is legally adequate to support a jury verdict on all elements of the crime. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. When reviewing the

sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. A conviction that is based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *Thompkins*, 78 Ohio St.3d at 386–387, 678 N.E.2d 541.

{¶ 76} In contrast, a manifest-weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. In making this determination, the court of appeals sits as a "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 77} Appellant was convicted of murder in violation of R.C. 2903.02(A), which provides, "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."

{¶ 78} In support of his eighth and ninth assignments of error, appellant states that none of the witnesses were able to place appellant at the scene of the crime. Appellant's arguments essentially focus on the testimony of Key's neighbor, Rubin Smith, who said that he saw appellant leaving Key's house on the night of the murder, as unclear.

{¶ 79} The jury in this case heard extensive testimony on behalf of the state from 11 family members, friends, and acquaintances of the victim; the Lucas County deputy coroner; seven police officers; and two forensic scientists. The defense presented four witnesses, one of whom was a friend of appellant's and three of whom were employees of a bar where appellant was seen the night of the murder.

{¶ 80} Key's father testified that he discovered Key's body in the bathroom of her home at approximately 6 p.m. on July 31, 2004, and immediately called 911. Key's father also testified that when he was standing outside the house after the police arrived, appellant approached him and said that when the police tested Key's fingernails for DNA evidence, they would see that he did not murder her. Additionally, Key's friend, Cheri Thompson, testified that appellant went to see her the day after the murder and told her that the police would not find his DNA under Key's fingernails because he did not kill her. He also told Thompson that he would not have to break into Key's house because he had his own key. Thompson described Key and appellant's relationship as "abusive."

{¶ 81} Yvonne Booth testified that Key had had a manicure before they went out to dinner on July 30. When shown a photograph of Key's fingernails after the murder, Yvonne stated that Key's nails were a lot shorter in the photo and did not look the same as they had earlier in the evening. Kenneth Johnson testified that he was a nail technician and gave Key a manicure on July 28 or 29, 2004. When he was shown the photograph of Key's fingernails after her death, he stated that it did not depict his work and that he had never seen her with fingernails that short.

-34-

{¶ 82} Several police officers testified about the condition of the scene when they responded to the initial call from Key's father. The Lucas County deputy coroner testified about her examination of the body at the scene and during the autopsy. She stated that she was unable to find any DNA evidence under Key's fingernails.

{¶ 83} Several of Key's friends testified that they had gone out to dinner with Key on the evening of July 30, 2004. Satyra Hodrick testified that Key had dropped her off at home around 10:00 p.m. At approximately 11:45, Key called Satyra and said that appellant had broken into her house. Key sounded upset, and Satyra told her to go somewhere else for the night. She did not hear from Key again.

{¶ 84} Key's friend, Teshauna Isaac, also testified that Key had called her shortly before midnight using another friend's phone and said that someone had pushed her window air conditioner in and had gone into her house; shampoo had been poured into her two house phones so that they would not work. Key told Teshauna that she was going back home to lock up and go to bed. Teshauna did not hear from her again. Teshauna testified that Key had been talking about breaking up with appellant for several months prior to the murder. Teshauna further testified that in April 2004, she took Key home after Key and appellant had an argument while the three of them were out at a local bar. When Teshauna returned to the bar after taking Key home, appellant told her he was going home "to beat his bitch ass." Teshauna left the bar later and went to Key's house. When she knocked on the door, appellant answered; he said he did not want any "bitches" calling the house and punched Teshauna in the face. Although Key and appellant still saw each other after that night, Key had made appellant move out of her house and had changed the locks. Teshauna considered appellant to be jealous and controlling and testified that Key was afraid of appellant. Key's friend Harriett Hardy also testified that she believed Key was afraid of appellant.

{¶ 85} Sevequa Glenn, Key's neighbor, testified that after dark on the night of the murder, she saw appellant, whom she knew was Key's boyfriend, drive up, park his car on the street, and walk to Key's house. Glenn saw appellant "mess with" one of the windows as if he were trying to open it. Glenn did not watch appellant continuously but saw him leave approximately 30 minutes later. As soon as appellant left, Glenn saw Key drive up. She crossed the street and told Key she had just seen appellant at her house.

{¶ 86} Rubin Smith, another of Key's neighbors, testified that he woke up in the middle of the night on July 31, 2004, and while he was looking out his kitchen window, he saw appellant leave Key's house and run to her garage. Smith stated that there is a light behind Key's house and that he had no doubt it was appellant he saw. Appellant was wearing jeans, a leather jacket, and gloves. Smith saw appellant back out of Key's garage on his motorcycle and slowly drive away. Smith further testified that the following afternoon, when he was standing outside with other onlookers after the police arrived, appellant approached him and asked whether he had heard or seen anything; Smith said he had not. Appellant then told Smith that if he said anything to the police "something bad was going to happen." Smith later told a detective what appellant had said.

{¶ 87} Sergeant Tim Campbell, who interviewed appellant after investigating the crime scene, testified that appellant had "fresh scratches" on his stomach and back. Appellant told him he was scratched the night before while shadowboxing with a friend. He told Campbell that he had his shirt on while shadowboxing.

-35-

{¶ 88} Jeannine Lamb testified that she lived next door to Key and that on the night of the murder, she heard a motorcycle directly outside at approximately 3:00 a.m. but did not see who was driving it. She further testified that appellant later "confronted" her and said, "[H]e knows where [she] stayed at," which frightened her. Appellant then told her that if she told anybody what she knew, "something would happen to" her.

{¶ 89} Toledo Police Sergeant Steve Forrester, supervisor of the cold-case unit, testified that the unit decided to reopen Key's murder case in 2006 upon the request of the original detective. Forrester testified that the unit examined phone records from three of appellant's phones and two of Key's phones prior to the murder and compared them to the statements appellant gave the police at that time. The detectives concluded that based on those comparisons, statements appellant gave during his interview with the original detective in 2004 could not have been true. In support of that conclusion, while acknowledging that the phone records cannot identify the individual making the calls, Forrester provided the following information. Between 4:26 p.m. and 9:15 p.m. on the evening of the murder, appellant placed 54 calls to Key. Also, during a one-hour period that evening—when appellant had told detectives that Key was with him at work—phone records showed outgoing calls from Key's home phone, one of which was to appellant's cell phone. There also was an outgoing call from appellant's business phone to Key's home phone during that time. Additionally, although appellant told the police that he went to Key's house between 9:00 p.m. and 10:00 p.m. that evening looking for her, the records showed 16 calls from his business phone during that time frame. Lastly, despite having told police he was at the bar from 10:00 p.m. until 1:00 a.m. that night, the phone records show at least nine calls made from appellant's business shortly after 10:00 p.m. Nine more were made shortly after midnight, also from his business. In all, between 10:06 a.m. on July 30, 2004, and 2:39 a.m. on July 31, 2004, a total of 93 calls were made from appellant's business and cell phones to Key's phones; 24 of those calls were made between 12:01 a.m. and 12:58 a.m. on July 31.

{¶ 90} Forrester also testified to other inconsistencies between appellant's statements to police the day of the murder and his statements to the detective when the case was reopened. Those statements concerned such issues as appellant's and Key's whereabouts on the evening of the murder, whether or not appellant knew that Key was going out to dinner with friends that evening, and whether he and Key were planning to get married in two weeks. Forrester also noted inconsistencies in appellant's statements regarding whether he was bothered by Key's going out to dinner with her friends, whether he was angry that she did not answer his calls that evening, whether he was concerned about her plans to leave town with friends that weekend, and whether the scratches on his chest happened while "play fighting" with a friend or during sex with Key the night before the murder.

{¶ 91} The defense presented testimony from the bouncer at the bar the night of the murder, who recalled appellant being there for a while but did not know what time appellant arrived or when he left. In contrast to appellant's original statement to police that scratches on his chest were the result of horseplay at the bar, the bouncer denied seeing appellant or anyone else "play fighting" enough to get scratched. The manager of the bar and the bar's owner both also confirmed that appellant was there but could not confirm exactly when appellant left.

{¶ 92} This court has thoroughly considered the entire record of proceedings in the trial court and the testimony as summarized above and finds that the state presented sufficient evidence from which, when viewed in a light most favorable to the state, a rational trier of fact could have found appellant guilty beyond a reasonable doubt

of murder in violation of R.C. 2903.02(A). See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, syllabus.

{¶ 93} As this court has consistently affirmed, the trier of fact is vested with the discretion to weigh and evaluate the credibility of conflicting evidence in reaching its determination. It is not within the proper scope of the appellate court's responsibility to judge witness credibility. *State v. Hill*, 6th Dist. No. OT–04–035, 2005-Ohio-5028, 2005 WL 2334701, ¶ 42. Further, based on the testimony summarized above and the law, this court cannot say that the jury clearly lost its way or created a manifest miscarriage of justice by finding appellant guilty of the charge of murder. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Accordingly, we find that appellant's eighth and ninth assignments of error are not well taken.

Based upon the factual findings set forth by the Sixth District Court of Appeals, the undersigned recommends that the Court find that the state appellate court applied the correct Supreme Court standard to Petitioner's sufficiency of the evidence claim, and that the Sixth District's application of *Jackson,* supra, was reasonable. Accordingly, the undersigned recommends that the Court find that Ground Ten is meritless.

### F.      Ground Thirteen - Ineffective Assistance of Counsel

I WAS PROVIDED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN THEY (1) FAILED TO OBJECT TO THE VENIRE AFTER THE ONLY AFRICAN-AMERICAN JUROR WAS EXCUSED (2) FAILED TO OBJECT TO THE CORONER'S TESTIMONY REGARDING TIME OF DEATH (3) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT (4) FAILED TO OBJECT TO HEARSAY TESTIMONY (5) FAILED TO OBJECT TO IMPROPER JURY INSTRUCTIONS REGARDING JURY'S RULE. MAKING IT IMPOSSIBLE FOR ME TO DEFEND MYSELF AND GET A FAIR TRIAL. (6) FAILED TO OBJECT TO THE TESTIMONY OF DET. STEVE FORRESTER. (7) COUNSELS FAILURES TO OBJECT WERE OBJECTIVELY DEFICIENT AND PREJUDICIAL. (8) THERE WAS NOT ONE PIECE OF DIRECT EVIDENCE LINKING ME TO THIS MURDER. NOR WAS THERE ANY EYEWITNESS WHO SAY'S THEY SAW ME COMMIT THIS MURDER NOR DID I CONFESS TO IT.

The Sixth District provided the following analysis of Petitioner's ineffective assistance of counsel claim:

{¶ 58} In support of his fifth assignment of error, appellant asserts that he was denied effective assistance of counsel in several respects. To prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied upon as having produced a just result. This standard requires appellant to satisfy a two-pronged test. First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that but for counsel's perceived errors, the results of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052,

80 L.Ed.2d 674. This test is applied in the context of Ohio law that states that a properly licensed attorney is presumed competent. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476.

{¶ 59} First, appellant asserts that trial counsel should have objected to the venire when the only African-American juror was excused. The record reflects that the juror in question informed the trial court that she did not want to judge another person and did not believe she could sit as a juror. After questioning the prospective juror at length and discussing the matter with counsel, the trial court excused her with the agreement of the prosecutor and defense counsel.

{¶ 60} The Sixth Amendment to the United States Constitution guarantees a defendant the right to have a jury drawn from a representative cross-section of the community. *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690; *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, fn. 1. In order to establish a violation of this right, the defendant must prove "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process. [Citation omitted.]" *Fulton*, paragraph two of the syllabus.

{¶ 61} Notably, appellant does not assert that Lucas County's system of jury selection systematically excluded African–Americans from his jury or that the prosecutor, trial court, or defense counsel acted wrongly in determining that the juror should be excused. Instead, appellant argues that once the juror was excused, counsel should have asked the court to secure more jurors in order to ensure that appellant would have had a jury chosen from a venire that included members of his race.

{¶ 62} In light of the law as set forth above, we are unable to find that appellant has established a violation of his right as set forth in *Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195. Further, appellant has not shown that trial counsel's representation fell below an objective standard of reasonableness in this regard or that counsel's conduct deprived appellant of a fair trial. This argument is without merit.

{¶ 63} Next, appellant asserts that trial counsel should have objected when the coroner testified as to the victim's estimated time of death. Appellant argues that the coroner's opinion was not rendered "to any degree of scientific certainty, probability, or even possibility" and that it was not based upon any "reliable scientific, technical or other specialized information." A review of the transcript reveals that the coroner's testimony was responsive to the prosecutor's specific question and was not objectionable. After the coroner testified in detail as to the condition of the body as she found it when she arrived at the scene, the prosecutor asked:

> {¶ 64} "Q. Based upon what you saw with respect to the skin slippage, were you able to make a determination to a reasonable degree of scientific certainty and medical certainty and based upon your knowledge, training and experience as a forensic pathologist regarding the general time of death of Cori Key?

> {¶ 65} "A. Well, no, you could never do that to any great scientific certainty. There is a range of time in which the death could have occurred or could not have occurred. But to narrow it down scientifically, no, that's not possible."

-38-

{¶ 66} The coroner explained why she was not able to point to a specific time of death to any degree of scientific certainty. She had already testified as to the "skin slippage" she observed, the heat in the bathroom, the state of decomposition, and her knowledge that the body had been left under the running shower for an extended period of time. As a result, she responded with a general range, based upon her examination of the body and, of course, based upon her experience as an expert in the field of forensic pathology. This argument is without merit.

{¶ 67} Additionally, appellant asserts that trial counsel was ineffective for failing to object to instances of prosecutorial misconduct, failing to object to the testimony of Detective Forrester, and failing to object when the trial court referred to determining appellant's "guilt or innocence." Having found appellant's claims as to those three issues not well taken under our analysis of Assignment of Error Nos. 2, 3 and 4, above, we find that this argument has no merit.

{¶ 68} Based on the foregoing, we find that appellant has not shown that counsel's representation fell below an objective standard of reasonableness or that there is a reasonable probability that but for counsel's perceived errors, the results of the trial would have been different. Accordingly, appellant's fifth assignment of error is not well taken.

The Sixth District's analysis of Petitioner's second assignment of error predicated upon Forrester's testimony is set forth above.  With respect to Petitioner's third and fourth assignments of error, the Sixth District provided the following analysis:

{¶ 49} In his third assignment of error, appellant asserts that prosecutorial misconduct during opening statement and rebuttal closing argument deprived him of his right to a fair trial.

{¶ 50} The Supreme Court of Ohio has held that counsel's misconduct "must be considered in the light of the whole case." *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768.  Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. *State v. Ballew* (1996), 76 Ohio St.3d 244, 667 N.E.2d 369. In closing arguments, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *State v. Stevens*, 2d Dist. No. 19572, 2003-Ohio-6249, 2003 WL 22764527, ¶ 34. Accordingly, a reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct. *State v. Smith* (1984), 14 Ohio St.3d 13, 15, 14 OBR 317, 470 N.E.2d 883.

{¶ 51} In the case before us, because defense counsel failed to object to any of the statements made by the prosecutor, our review of the alleged improper statements is discretionary and limited to plain error only. Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the trial court." However, this court has held that "notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. In order to prevail on a claim governed by the plain error standard, appellant must demonstrate that the outcome of his trial would clearly have been different but for the

errors he alleges." (Citations omitted.) *State v. Jones*, 6th Dist. No. L–05–1101, 2006-Ohio-2351, 2006 WL 1305097, ¶ 72.

{¶ 52} First, appellant argues that during opening statement, the prosecutor told the jurors that they would hear testimony describing how Boles broke into Key's house on the night of the murder and was later seen running out of her house. Appellant asserts that there was no such testimony. Appellant also argues that during rebuttal closing argument, the prosecutor told the jury that appellant had tried to rape Key on the night she was murdered. Finally, appellant argues that the prosecutor improperly vouched for the credibility of Jeannine Lamb and Rubin Smith when he stated, "We would submit to you [Lamb is] stone cold sober when she hears that from him, and the same thing with Rubin." The prosecutor was referring Lamb's and Rubin's testimony that appellant threatened them with harm if they told anyone what they had seen the night of the murder.

{¶ 53} This court has reviewed the state's rebuttal closing argument in its entirety. We have also considered the prosecutor's statements in the context of all the evidence presented at trial. Upon consideration thereof and the law, we find that the trial court did not commit plain error by allowing the jury to hear the prosecutor's statements without objection and, further, that appellant has not demonstrated that the outcome of his trial would clearly have been different but for the prosecutor's statements. Accordingly, we find appellant's third assignment of error not well taken.

{¶ 54} In support of his fourth assignment of error, appellant asserts that the trial court improperly instructed the members of the jury that it was up to them to determine appellant's "guilt or innocence." Appellant emphasizes that it is the role of the jury to determine whether the state has proven each and every element of the offense beyond a reasonable doubt.

{¶ 55} Again, we note that trial counsel did not object to the contested language. Therefore, the trial court's statement will be reviewed under the plain-error standard as set forth above.

{¶ 56} This court has reviewed the trial court's instructions to the jury in its entirety. The statement in question was made right after the trial court instructed the jury as to numerous matters, including its job of determining whether the state proved beyond a reasonable doubt all of the essential elements of the offense of murder. Immediately thereafter, the court stated: "You may not discuss or consider the subject of punishment. Your duty is confined to– your duty is confined to the determination of the guilt or innocence of the defendant. In the event you find the defendant guilty, the duty to determine the punishment is placed by law upon the Court." It is clear the statement was made as part of the trial court's admonition for the jury not to consider the subject of punishment during its deliberations.

{¶ 57} The Supreme Court of Ohio has addressed this issue, holding, "At most, the use of the phrase 'guilt or innocence' in this limited context relating to punishment is totally inconsequential." *State v. Coley* (2001), 93 Ohio St.3d 253, 267-268, 754 N.E.2d 1129. The trial court herein used language identical to that at issue in *Coley*. Additionally, we find that appellant has not shown that the outcome of his trial would clearly have been different but for the error he alleges. Accordingly, appellant's fourth assignment of error is not well taken.

It is important to note that the Sixth District did not address Plaintiff's ineffective assistance of counsel claim predicated upon the admission of the hearsay testimony. However, to the extent

-40-

that the Sixth District found no merit in Petitioner's substantive claims in the first assignment of error, predicated upon the admission of the testimony of Smith and Hodrick, it appears that the Court would have relied upon their substantive analysis of that claim to reject the ineffective assistance of counsel claims, as they did with the second third, and fourth assignments of error.

In order to establish ineffective assistance of counsel, petitioner must show that counsel's performance was deficient, and that such performance prejudiced the defense, i.e., that counsel's errors were so serious as to deprive petitioner of a fair trial.  See, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Judicial scrutiny of a counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689.

Because of the difficulties in assessing counsel's performance, a reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Petitioner must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, supra.  This is a high burden to meet:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689, 104 S.Ct. 2052 (citation and internal quotation marks omitted).

"The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 131 S.Ct. at 785. Indeed, "because the *Strickland*

standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009). Pursuant to §2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S.Ct. at 788.

Having reviewed the Sixth District's analysis of Petitioner's ineffective assistance of counsel claims, the undersigned finds that the Sixth District's application of *Strickland*, as well as the other Supreme Court precedent at issue in its analysis, was reasonable. The Sixth District applied the outcome determinative *Strickland* test to each of Petitioner's claims, ultimately concluding that Petitioner had failed to overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. Accordingly, the undersigned recommends that the Court find that Ground Thirteen has no merit.

## VII.  CONCLUSION

In summary, the undersigned recommends that the Court find that Grounds One through Six, Eight, and Ten through Twelve are procedurally defaulted. In the alternative, the undersigned recommends that the Court find that Grounds One though Three have no merit. Finally, the undersigned recommends that Grounds Seven, Nine, and Thirteen have no merit. For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: October 22, 2012                    */s/ George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).